UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MICHAEL LANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cv-04456-JMS-TAB |
| | ) | |
| VIGO COUNTY COMMUNITY CORRECTIONS, et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT**

In February 2019, a Vigo County judge authorized Michael Landers to serve the final five years of his prison sentence in a work-release program. Within two weeks, he allegedly violated the program's rules, and he was sent back to state prison. Mr. Landers was not given a hearing first, and he alleges that this deprived him of due process in violation of the Fourteenth Amendment.

The defendants move for summary judgment. Because Mr. Landers' return to prison did not affect a liberty interest, the motion is **granted**, and the action is **dismissed with prejudice**.

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

Mr. Landers failed to respond to the summary judgment motion. Accordingly, facts alleged in the motion are deemed admitted so long as support for them exists in the record. *See* S.D. Ind. Local Rule 56-1 ("A party opposing a summary judgment motion must . . . file and serve a response brief and any evidence . . . that the party relies on to oppose the motion. The response must . . . identif[y] the potentially determinative facts and factual disputes that the party contends demonstrate a dispute of fact precluding summary judgment."); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[F]ailure to respond by the nonmovant as mandated by the local rules results in an admission"); *Brasic v. Heinemanns, Inc.*, 121 F.3d 281, 285-286 (7th Cir. 1997) (affirming

grant of summary judgment where the nonmovant failed to properly offer evidence disputing the movant's version of the facts). This does not alter the summary judgment standard, but it does "[r]educe[] the pool" from which facts and inferences relative to the motion may be drawn. *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997). Thus, "[e]ven where a non-movant fails to respond to a motion for summary judgment, the movant 'still ha[s] to show that summary judgment [i]s proper given the undisputed facts.'" *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011)).

**II. Facts**

In February 2019, Mr. Landers was incarcerated at the Indiana State Farm. Dkt. 41-1 at 5:1–4. His earliest possible release date was March 7, 2025. Dkt. 41-7.

Mr. Landers had a motion to modify his sentence pending in Vigo Superior Court. At a hearing on February 28, Judge Michael Lewis granted the motion. *Id.* Judge Lewis approved Mr. Landers for admission to a Community Transition Program ("CTP") effective the following day, March 1, 2019. *Id.* Mr. Landers' sentence would continue to run through March 7, 2025, but he could serve the remainder of the sentence in a CTP coordinated by Vigo County Community Corrections ("Community Corrections"). *Id.*

Following the sentence modification hearing, Mr. Landers was shackled and transported to the Work Release Center ("WRC"), where CTP participants lived. Dkt. 41-1 at 11:23–12:8. Mr. Landers describes the WRC as "a dorm-like setting." *Id.* at 11:19. Residents were subject to extensive rules and regulations that, in many ways, resemble a correctional facility. *See* dkt. 41-2.

The WRC was staffed with correctional officers, and residents were required to address staff members as "Officer," "Mr.," or "Mrs." *Id.* at § 24. Residents were searched every time they entered the facility, and they were subject to unannounced searches at any time inside the facility.

*Id.* at § 15. They were subject to the same disciplinary code enforced in Indiana Department of Correction ("IDOC") facilities. *Id.* at § 25. The building had metal detectors. Dkt. 41-1 at 20:15–16. At least some of the time, Mr. Landers was escorted through the WRC by staff members. *Id.* at 20:17–21:18.

WRC residents' daily activities were strictly regulated. Residents were required to be in their bunks from 11:00 P.M. until 5:00 A.M. every day. Dkt. 41-2 at § 28. They were required to shower and make their beds every day and keep their bunks in a specific way—no personal items or pictures displayed, laundry bag hung at the foot of the bed, towels hung from the head of the bed. *Id.* at § 11. Residents had to wear shirts, pants, and shoes at all times, and jewelry was prohibited. *Id.* at § 14. Residents could only eat food served or purchased inside the WRC, and meals were served at set times every day. *Id.* at §§ 17–19. Personal property was limited to specific types and quantities of clothing, toiletries, and miscellaneous items. *Id.* at § 41.

Of course, the WRC differed from prison in that residents were permitted to leave—they were released from the facility to work. But even this was subject to extensive regulation and numerous exceptions. Residents had to submit their work schedules every week and could only leave according to those schedules. *Id.* at § 4. When they returned, they had to show documentation of their whereabouts for the entire day. *Id.* at § 3. Residents were not allowed to work more than 60 hours per week. *Id.* at § 2. They were limited to workplaces within 30 minutes of the WRC. *Id.* Residents could not work out of home offices, and they could not work outdoors after 8:00 P.M. *Id.* Residents with certain jobs could not work on holidays (when the WRC staff was limited), and they might not be permitted to leave for work during heavy snow. *Id.* at § 8.

Mr. Landers completed CTP orientation on Wednesday, March 6, 2019. Dkt. 41-2. He received a GPS ankle monitor. Dkt. 41-1 at 13:9–16. On Friday, March 8, Mr. Landers left the

WRC to look for a job, and he states that he made an unauthorized visit to his mother's house while he was out. *Id.* at 13:24–15:1. But, according to Brad Burton, a case manager, two of the victims in Mr. Landers' criminal case notified Community Corrections on March 8 that Mr. Landers "had made threats to them." Dkt. 41-9 at 1. Data from Mr. Landers' ankle monitor indicated that he "walked around" his "victim zone" for about 20 minutes on March 8. *Id.* at 1–3.

On Monday morning, March 11, the WRC staff notified Mr. Landers that he was under investigation for threatening the two victims, that a conduct report had been written, and that he would be returned to state prison. Dkt. 41-1 at 20:1–21:24. On Thursday, March 14, Mr. Landers was transported to Plainfield Correctional Facility. *Id.* at 4:7–9, 21:25–22:4. He has been incarcerated in IDOC facilities since then. Mr. Landers states that he has never had a disciplinary hearing regarding the allegation that he threatened his former victims.

## III. Analysis

At screening, the Court identified plausible Fourteenth Amendment claims against two defendants—Community Corrections and Bill Watson, who was deputy director during Mr. Landers' time in the CTP. These claims are based on the theory that the defendants deprived Mr. Landers of liberty without affording him due process by returning him from the WRC to state prison without holding a disciplinary hearing.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). "A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies . . . ." *Id.* (internal citations omitted).

**A. Constitutional Liberty Interests**

"[O]nce an inmate has been released from institutional confinement, the Due Process Clause does confer upon him certain liberty interests allowing him at least to remain free from detention and outside the prison's walls." *Hoffman v. Knoebel*, no. 4:14-cv-00013-SEB-TAB, 2017 WL 1035933, at *4 (S.D. Ind. Mar. 17, 2017). Of course, all prisoners are not released under the same circumstances. The Supreme Court has made clear that parole creates a Fourteenth Amendment liberty interest and that "[i]ts termination calls for some orderly process, however informal." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). The same is true for "pre-parolees." *See Young v. Harper*, 20 U.S. 143 (1997). Meanwhile, the Seventh Circuit has held that an offender sentenced to a "home detention program" has a liberty interest in remaining out of prison. *See Paige v. Hudson*, 341 F.3d 642, 643–44 (7th Cir. 2003).

In other cases "where the convict is not technically 'imprisoned,'" the law "is still evolving." *Domka v. Portage Cty.*, 523 F.3d 776, 781 (7th Cir. 2008). The dispositive question is "whether being removed" from one situation to the other "is a sufficiently large incremental reduction in freedom to be classified as a deprivation of liberty." *Paige*, 341 F.3d at 643.

Neither the Supreme Court nor the Seventh Circuit has considered Mr. Landers' particular situation—confinement in a residential work-release program operated by a county community corrections agency. But this Court has. *Hoffman* concerned a state prisoner who achieved sentence modification, was transferred to the Clark County Work Release Center, and was detained in county jail for over two months awaiting a hearing after he was accused of violating program rules. *Hoffman*, no. 4:14-cv-00013-SEB-TAB, 2017 WL 1035933, at *1. Judge Barker determined that "the relevant considerations" in assessing an incremental reduction in freedom "are: 'where the inmate is housed; the restrictions on his freedom, movement, and employment; and his overall

ability to live a life without the incidents of imprisonment.'" *Id.* at *5 (quoting *White v. Steuben Cty.*, 2011 WL 4496504, at *7 (N.D. Ind. Sept. 27, 2011). She determined that moving Hoffman from the work release facility to jail without a hearing did not implicate a liberty interest. *Id.*

There is no reason Mr. Landers' case should produce a different result.

Mr. Landers was housed in an environment that resembled a correctional facility. He arrived there in shackles. It was staffed with correctional officers and outfitted with metal detectors. It maintained strict schedules for meals and bedtimes. It enforced the same disciplinary code as state prisons.

Mr. Landers' freedom, movement, and employment were all regulated. Inside the building, he was escorted by staff members and subjected to unannounced searches. Mr. Landers had to bathe, dress, and maintain his bunk area in compliance with the WRC's rules. He could only eat food and keep property approved by the WRC staff. He could leave the WRC to work—but only in certain locations and at certain times.

During his brief time at the WRC, nearly every aspect of Mr. Landers' life was constrained by the "incidents of imprisonment." *Hoffman*, no. 4:14-cv-00013-SEB-TAB, 2017 WL 1035933, at *5. It is not clear that life in the WRC differed at all from life in prison except that Mr. Landers could leave prison to search for or work at a job—and he could only do that within the strict parameters imposed by County Corrections. If Mr. Landers suffered an incremental reduction in liberty when he was returned to state prison from the WRC, it was minimal. Mr. Landers' return to prison did not affect a liberty interest inherent in the Fourteenth Amendment.

**B.      State-Created Liberty Interests**

Mr. Landers did not have an inherent, constitutional liberty interest that guaranteed him a hearing or any other due process before being removed from the CTP and returned to state prison.

But "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin v. Conner*, 515 U.S. 472 (1995)." *Wilkinson*, 545 U.S. at 222. "[T]he touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Id.* at 223 (quoting *Sandin*, 515 U.S. at 485).

Again, neither the Supreme Court nor the Seventh Circuit has applied the *Sandin* analysis to the facts of this case, but this Court did in *Hoffman*. The dispositive question, Judge Barker determined, is whether removal from work release to state prison is "'atypical or significant when compared to the experience of the large number of prisoners who spend the duration of their sentences in prison.'" *Hoffman*, no. 4:14-cv-00013-SEB-TAB, 2017 WL 1035933, at *8 (quoting *White*, 2011 WL 4496504, at *10). This Court, like others inside and outside the Seventh Circuit, held that it does not. *Id.* (collecting cases). Convicted offenders sentenced to prison terms "typically serve out their sentences in institutional confinement." *Id.* Programs like work release are the exception to the rule. Returning an inmate from such a program to state prison returns him to "'the ordinary incidents of prison life,'" *Wilkinson*, 545 U.S. at 223 (quoting *Sandin*, 515 U.S. at 485), not a substantially harsher environment.

The legal landscape has not changed since this Court decided *Hoffman*, and nothing in the record suggests that Mr. Landers returned to an atypically harsh state prison setting. *See, e.g.*, *Wilkinson*, 545 U.S. at 223–24 (finding a liberty interest in avoiding indefinite assignment to environment where "almost all human contact is prohibited" and parole eligibility is terminated). Accordingly, a different result is not warranted. Mr. Landers' return to state prison from the CTP did not affect a state-created liberty interest.

## IV. Conclusion

The record shows that Mr. Landers' Fourteenth Amendment claims are not grounded in a liberty interest. Accordingly, the defendants' motion for summary judgment, dkt. [41], is **granted**, and this action is **dismissed with prejudice**. The **clerk is directed** to enter **final judgment** consistent with this order and the screening entry, dkt. [13].

**IT IS SO ORDERED.**

Date: 9/7/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

MICHAEL LANDERS
167561
PENDLETON - CORRECTIONAL INDUSTRIAL FACILITY
CORRECTIONAL INDUSTRIAL FACILITY
Inmate Mail/Parcels
5124 West Reformatory Road
PENDLETON, IN 46064

David P. Friedrich
WILKINSON GOELLER MODESITT WILKINSON AND DRUMMY
dpfriedrich@wilkinsonlaw.com